We have a second of our two cases this morning and we have number 14-1070 Bayshore Ford Truck Sales v. Ford Motor Company. Mr. Alwick and Mr. Perella. May it please the court. Good morning. Good morning. My name is James Alwick. It's my privilege to represent the appellants in this case, the 63 small businesses who were once Ford heavy truck dealers. With the court's permission I would like to make three points of rebuttal. You surely may. There are three points I would like to make here this morning. First, that you are not bound by the panel's unpublished non-precedential decision in 12-4342. Let me start on that one and why is that? Because the panel in 12-4342 only had jurisdiction under 28 U.S.C. 1291 over the 11 plaintiffs who had proceeded to final judgment that they obtained through Rule 54B. So that final judgment was binding on only those 11 plaintiffs in that case and not on the 63 plaintiffs that came in this appeal. Just as an aside, I guess, when there was a liability judgment in favor of those 11 plaintiffs, they were saying, the 63 were saying in effect, well that should apply to us. But then what happened in Bayshore 1, if you want to call it that, was that that got reversed and now you're saying, well, don't apply it. Don't apply what applies to some to all. Well, Your Honor, I believe what Your Honor has done is skip a couple of steps that occurred. The first thing that occurred, there was summary judgment that was granted and a class that was certified. And so the summary judgment was applied to each and every member of the class. Then the judge, at the request of Ford, decertified the case on the issue of damages and notified each and every one of the plaintiffs who were left that you are going to have to go forward and prove your individual case. That's correct. Every single one of them. It's a notice. It's an A-114. But the appeal by Ford was on both liability and damages, was it not? Sure. As to those 11 plaintiffs. As to the 11 on damages and as to certainly the 11 on liability, but why would the decision on liability, if it's reversed, which it was by this court, not apply to the others when you said as to liability at one point when the decision went your way, it should apply to all. Because you never had jurisdiction over any of the 63. You could not have had jurisdiction over any of the 63. What happened is the unpublished decision was binding on only those parties in that appeal. Who were those parties? Those parties were Ford and the 11 dealers. Did the class exist at that time? Sorry? Did the class exist at that time? I would say it didn't, actually. Why? Tell me why. Because the class was certified for an issue only. And then when the judge decertified for damages, every single one of those class members now had to go forward as an individual. What actually happened, Judge Sirica, is that every one of them were told by Judge Linares in the notice he sent to them, it's A-114, you have to go forward and prove your own individual case. Sure. I'm sorry. Yeah. Before you get to that point, assuming the Third Circuit panel had affirmed, what would have been the effect of that judgment on the other members? It would have gone back down and the remaining 63 would have asked the court to apply that judgment on the principles of collateral establishment. So they would have had the benefit of it. Assuming the judge ruled in their favor, Ford would have certainly opposed it. I understand that. And that's not an uncommon situation in a mass tort or a situation where you have multiple parties who are in similar situations. You're saying that's a one-way street, that they could claim estoppel if on liability the Court of Appeals had affirmed, but you're saying they can't be bound at all when the Court of Appeals reversed on liability. What I'm saying is it's a matter of jurisdiction. And this court in the Boghossian case said that this is the kind of thing that can happen under Rule 54B, that we weigh the benefits of having under 54B the right to have some of the plaintiffs or defendants go up with their issues because they have a final judgment as to them and we're going to sever them from everybody else. And yes, it is going to be this case where we, the Court of Appeals, as you said in Boghossian, are going to have to deal with this potentially the same issue more than one time, but that is the price you pay for the economies and the benefits that Rule 54B allows. So it is a question of jurisdiction, and this court may have jurisdiction. So you can have inconsistent verdicts of people that are similarly situated. Well, the rule of stare decisis, as the court said in Boghossian, is going to take care of most of that. In most cases where the decision has been applied, the fact of the matter is that you're going to apply the same decision that went the first time around. This case that was decided here was non-precedential and non-binding under your internal operating rule, so you don't have stare decisis. So the question becomes, when we look at the decision that was returned in 43-42, should we follow it? What about law of the case? Law of the case doesn't apply here, Your Honor, and I'll tell you why. Law of the case doesn't apply where new evidence or new law or the court concludes that the earlier decision was erroneous. That's in range city of Philadelphia litigation, 158 Fed 3rd, 711 at 718, Third Circuit case from 1998. And what this court said in the Hamilton v. Levy case at 322 Fed 3rd, 776, revisiting the reasoning of a previous decision is especially, and I'm quoting, appropriate when the record contains new evidence that differs materially from the record evidence at the time of the previous decision. What is the new evidence? The new evidence is that this court assumed that the Ford dealers were going to be receiving Ford parts under the Ford contract from Ford. It is a material, it is the linchpin of the decision. It was based upon the concessions made at oral argument. No, ma'am. I was there. I heard the oral argument. I was there, and I was the one who Your Honor may be saying made the concessions, and I didn't say that. No, I think what happened there was at oral argument Judge Rendell asked Ford's counsel, were there still products being sold? Ford's counsel, yes, and more importantly, there was still warranty work being done and honored, and that is an important point. That is not some glancing opportunity. Judge Rendell, is that in the record? Ford, it is. Let me tell you why we got off track on that. Okay. Because what happened is, yes, the former Ford dealers who signed up as Sterling dealers received the opportunity to buy Ford parts, and so if you just ask the question, were they continuing to get Ford parts? They were, but here's the problem. The cost of that, the burden of that for every Ford dealer who decided that they wanted to buy Ford parts was they had to sign a Sterling service and a sales agreement. It was a straight line and not Sterling. It was a Sterling. Your Honor, I can give you the site in the record. It's 902, and what you will see is this is when Ford said, we are stopping getting out of the parts business. We will no longer be in the parts business, and as of March, I think it's 12, 1998, that's the last day you can put in an order for it. And if you want any further parts, you can only get that if you sign a Sterling sales and service agreement. And if you don't sign a Sterling sales and service agreement, you must buy those parts from an authorized Sterling dealer, meaning you walk up to the window like anybody else and you pay retail and you get them to pay the parts to you. It was not being provided through the Ford contract, which is critical. That was critical to Your Honor's decision, and it was wrong. And for that reason, you cannot follow that decision. There is no question. If you look at the record, there is absolutely no dispute that the parts were not being provided. Let's just assume for the moment that you're correct. That would perhaps take care of a lot of the case, but come back to issue preclusion. How do we get around that? With regard to issue preclusion, Your Honor, the question you'd have to say is whether or not there was privity between the parties, between the plaintiffs. Didn't one counsel represent everybody but three of the 74? Yes, but what I would suggest to you, two answers. Once the class was decertified, there was no more privity. The individual cases had to be prosecuted by each and every plaintiff to conclusion. Every one of those individual plaintiffs had to sign up their own individual deal with a lawyer. We signed individual deals with every single plaintiff that we represented and went forward to prosecute their cases. Under Boghossian, as I previously argued, that means that those judgments were individual judgments. Secondly, privity is only relevant if issue preclusion applies, Your Honor, and it cannot apply in these circumstances. The Supreme Court has held in Montana v. United States, 440 U.S., 147, quote, redetermination of issues, which is what we're asking here. Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation. This court said in United States v. Silliman that issue preclusion is a rule of policy. That's 167 Fed Second 607. Such a rule of public policy must be watched in its application lest a blind adherence to it tend to defeat the even firmer established policy of giving every litigant a full and fair opportunity to litigate their case. In Montana, the United States controlled that litigation entirely. Then they tried to come back in again. I'm not sure that that's apt here. I think what the point I'm seeking to make is that when we all know, everybody in this room knows, that a linchpin fact of the prior unpublished decision is wrong, how can we apply it then to people who were not before the court at that time or whom this court had no jurisdiction and to their great detriment as an incorrect material fact ruled against them in essentially a summary judgment proceeding without their opportunity to brief it or show that it's wrong? This was not a matter that was briefed anywhere in the hearing at 1243-42. Look at Ford's briefs. They are in the appendix. Not a single issue that Ford presents there has this issue in it. It wasn't briefed by either party. It wasn't raised in summary judgment. I think what happened at Bayshore, wasn't there a letter sent to the court asking to put in some supplemental information post oral argument in Bayshore 1? We, the appellants representing the 11 dealers, when the oral argument occurred, we asked permission to have a supplemental brief filed so that we could introduce the fact and show the court that the fact that was being discussed was incorrect. This court denied us that opportunity to do that as saying it was unnecessary. So if for 11 in a Bellwether trial, a court, in this case the appellate court, has come down with ruling X on liability, and if the 63 were included or added to those 11 at that time, rightly or wrongly, they would have lost at that time. You're saying now that that decision for the 63 should go the other way, despite the fact that we have something on record that is X and not Y, which is what you want. I am saying that because you didn't have jurisdiction over those 63 in that appeal. You couldn't have had jurisdiction over them. They didn't have final judgments, not a single one. The district court had jurisdiction over those 63, but you're saying only the 11 appealed and there was no longer a class certified for damages, but was there a class still certified for liability? It was never decertified as liability. No, but it's a hypothetical issue because what happened is that once the summary judgment was entered, it was entered for each one of those individuals, and what happened is that a third of that class decided not to go forward with their case. So it didn't go forward as a class case at all. I thought that there was a common understanding that the class Y liability determination would be reviewed in the Bayshore One appeal. What the parties said to the court, the reason they wanted to have a 54B judgment, is they wanted to have a bellwether, and this would be a substantial step towards settling the case. We would have a good sense as to what the case was worth. And I can tell you, Your Honor, if the case hadn't been decided on a fact that was absolutely wrong, we in all likelihood wouldn't be here. I've been a lawyer for 37 years. I've never seen this happen before, to have something that was raised for the first time in oral argument. It wasn't raised for the first time in oral argument. In oral argument, the question was what had been done and not done that would indicate whether Ford had gone along, had provided what it needed to under the dealership agreement, and that is one of the issues that was to be considered in determining whether the agreement had been breached or not. Respectfully, Judge Roth, what happened at oral argument is a question was asked, what's the breach here? And I answered that the breach was the failure to supply heavy trucks. And Judge Rendell said, well, what about parts? It says that parts is part of this as well. Ford's counsel jumped on that and said, well, they're still supplying parts. Or they're still getting parts. When you read the dealership agreement, parts and trucks are included in the description of what can be discontinued. Well, that's under Paragraph 13, Your Honor, and we think that if you compare Paragraph 13 in this agreement to Paragraph 20 in Bono Sales, you cannot find any difference between the two. We found considerable difference between Bono Sales and this agreement, but we are re-arguing that in this appeal. Your Honor, I did not decide that. That was not decided in the first spatial appeal. You have made no finding at all about what the meaning of Paragraph 13 was in the Ford Sales and Service Agreement. I believe there is discussion in the opinion that maybe it's simply in our oral argument, but we did distinguish. Your Honor, you are found because there was a material fact that showed that there was parts that were being continued to be supplied to the Ford dealers that that showed that there was no breach and you didn't need to go further than that. You did not address the issue of whether or not. Well, we discussed it at oral argument. We certainly discussed it at oral argument. And it was an inclusion that we carried forward into our decision on the case. It's not in any part of that decision that was published, Your Honor. It's not. As I understand what your argument was back then, is that your case was governed by our in-bank decision in Bono Sales. Correct. But the thing that would distinguish it is if there were parts being sold. So it was a very key point. Were there parts being sold? And I read to you something where these Ford's counsel said in answer to Judge Randell that parts were continuing to be sold post-sale to Franklin. They were. But they were being sold by Sterling. And they were being sold only the only way a Ford dealer could obtain the Ford parts that he had a right to obtain under his Ford contract was to sign a new agreement with Sterling in which he agreed to sell Sterling trucks, in which he agreed to put up a Sterling sign, in which he agreed to change his hours of service. So what you're saying, I suppose, is that the only argument that could be held that parts were being sold is somehow that Ford had delegated to Sterling or whatever. And that's their argument here. And it's wrong. That's on page 41 of the brief. I saw that. Right. And it's wrong because if you require somebody, the recipient of production under the performance, rather, under the contract, to sign a new and much different and onerous agreement in order to get the rights you already had, that's not delegation. So basically what you're saying is subsequent after March 12, 1998, there were no parts sold by Ford to these dealers. Okay. All right. Let's hear from the cousin counsel. Your Honor, am I permitted any rebuttal on whether I forgot my welcome? We'll get you back for at least three minutes. Thank you. May it please the Court, Dominic Pirella for Ford Motor Company. Good morning or afternoon, as the case may be. Let me begin with what I think is the dispositive issue in this case, which is issue preclusion. We have a situation here where, as my ---- On the fact issue, could you respond to the point that your cousin counsel has made? Sure. I can start with that. Did Ford continue to sell parts post March 12, 1998? I think the best answer to that question is that Ford continued to work with Freightliner to make sure that parts were provided to the dealers. And let me explain. This is all actually set forth at pages A858 to A862 of the Joint Appendix, which is part of the Ford Freightliner Asset Purchase Agreement. I'm sorry. Page what? It's 858 to 862. Okay. At those pages, it lays out how the parts and service operation will work after the Ford Freightliner transition. And what it says fundamentally is that Ford and Freightliner will cooperate to make sure the parts get to the dealers. And that happens in several ways. One way, as my friend on the other side correctly stated, is that the parts business was sold to Freightliner. And so after 1998, the dealers had to send their orders for parts for unique heavy truck parts to Freightliner. But in addition to that, first of all, all of these parts ---- I think it's important to note not all, but at least most ---- were made by third-party vendors always. So prior to 1998, Ford got the parts from the third-party vendors, sent them to the dealers upon order. After 1998, Freightliner got the parts from, I believe, most or all of the same third-party vendors, and sent the parts on to the dealers. Secondly, Freightliner and Ford mutually agreed in this agreement that they would work together in several different ways. Freightliner could ask Ford to send parts to Freightliner to fill orders. Freightliner could ask Ford to send parts directly to dealers to fill orders. And in addition to all of that, Ford, of course, continued paying for these parts with respect to warranty service because the dealers would put the parts in and Ford would pay for the work. And actually, one last point. In addition to all of those points, Ford also, at least in some respects, licensed its trademark to Freightliner for these parts. So when dealers bought these parts, they were Ford parts, and the dealers in their testimony quoted in our brief referred to them as Ford parts. And so I think the idea that I'm trying to get at here, the notion that the Bayshore One decision was a miscarriage of justice, which is the law of the case standard, is wrong. The decision was not a miscarriage of justice. In fact, it was quite defensible on the facts and on the law. Now, if I could, I'd like to back up to issue preclusion. I think that the Court doesn't even need to reach the points I've been articulating because issue preclusion clearly applies here. We have a situation where there was a certified liability class always, all throughout the case. It was never decertified as to liability. In 2009, the District Court applied its summary judgment ruling as to liability to the entire class. That ruling went up on appeal in Bayshore One necessarily because it was the only liability ruling as to the other eight bellwether dealers in that appeal. And the Third Circuit reversed on that liability ruling with respect to the class representatives of the certified class. By the key point being a, what Mr. Allna claims, is a contention relating to the dispute as to whether parts were sold or not. If Ford was not selling parts post-sale, then the argument he would make is that this case is almost identical to Bono sales. And ironically, Bono sales applied Michigan law just like this case has Michigan law. Let me respond to that in two parts. The first part is I don't think that that's relevant to the issue preclusion argument. The question is whether a breach was adjudicated against the class, and it was. The class representatives adjudicated breach. They lost. There was a class. And as the court, the Supreme Court, and this court, and Taylor, Richards, and Collins, the three main cases on which we rely, pointed out the issue with respect to representation and representative litigation. There are two key pieces, notice and adequate representation. There's no question that both of those are present here. The dealer class was notified repeatedly about the status of the litigation. The appellees, in fact, repeatedly chose to use plaintiff's counsel to continue moving forward with the damages portion of the case. And the district court explicitly found that representation was adequate at pages A40 to 41 and A50 to 52 of the joint appendix. Now turning to the second piece of your question, Judge Ambrose, you asked about Bono sales. I think the court doesn't have to reach this alternative ground, which is the third piece of our presentation in our brief. But with respect to Bono sales, I think it's distinguishable. Your strongest arguments are clearly issue preclusion and judicial estoppel. Well, I think issue preclusion and judicial estoppel both work. And let me, as an aside there, as we point out in our brief, and I think this is important, the class representatives, specifically Bashore Ford, represented to the U.S. Supreme Court in their cert reply in this case that they were there in a representative capacity and that the Supreme Court's judgment would bind the class members. I think that's quite important. The Taylor and Richards cases say that the understanding of the class representative about whether they are acting in a representative capacity goes to the question of adequate representation. But coming back to the Bono sales. So in Bashore 1, when they applied for cert, you're saying what? I beg your pardon? When the other side applied for cert in Bashore 1, they said what? That they were representing all? There was an issue in Bashore 1 about whether their application was timely as to all of the petitioners. We argued that it was not. And one of their responses in their reply brief, and I can quote it for you, they said there were several reasons why they said it was timely. But one of them in the cert reply, I believe at page 9, is that Bashore 1, excuse me, Bashore Ford was a certified class representative. They were timely. And accordingly, the Supreme Court's judgment would apply to all the class members because, quote, any relief Bashore Ford obtains extends to the entire class of dealers, unquote. That's the precise logic that they're now disclaiming. So I think there is a judicial estoppel issue here. But moving forward, Judge Amber, I think there's two other grounds, in addition to the two we've discussed, on which you could affirm. The first one being law of the case. Again, the exception, at least in most of the cases that I've read, the only exception is miscarriage of justice. And in this case, there is no such miscarriage for the reasons I discussed with respect to the facts. And then the last ground, of course, is the one that this court accepted in the FET decision, that Judge Sirica was on the panel, and that is that the contract allows Ford to stop selling these trucks regardless. And I think that their contrary argument relies on the Buono case. I think that case is distinguishable in three respects. The first one is that the contract language in Buono says that the car manufacturer could stop selling, could discontinue lines or models of cars. Is this De Soto? Yes, that's correct. And both the majority opinion and the dissent, well, the majority opinion said lines is too indeterminate to get you there. Lines doesn't mean De Soto's writ large, and the dissent understood the majority to be saying as much. Point two, I think this is perhaps just as important. The court in Buono understood the effect of De Soto's argument to be that it could completely terminate the contract by a backdoor method without using the separate termination clause, and it thought that would make the termination clause a melody. Here, there's no question that the contract was not entirely terminated by the cessation of truck sales. Ford continued to have a service and parts relationship, and Freightliner did, with these dealers for years, in fact, all the way through at least 2009. The dealers, of course, had the right to terminate the contract at any time for any reason and did not do so. Precisely because they wanted to have that contractual relationship, they were making two-thirds of their profits from it. That's at appendix page 905. By the way, why didn't you terminate the agreements here after this sale to Freightliner with the dealer? Why didn't you terminate the agreements with the dealers? I think the record reflects a couple of reasons. One reason is that Ford recognized that it had a responsibility to these dealers to make sure they were going to keep getting parts, and so they said, look, we're going to set up a situation where you can still sell heavy trucks if you agree to work with Freightliner, which will now make heavy trucks, and you can still get parts if you work with us, and so we're not going to terminate this because the parts business will be ongoing. You're saying the parts were made by third-party vendors. Ford did what? You say it assigned its trademark for those parts to whom? I don't want to be categorical about any of these statements because I'm basing this on the contract as to how the Ford-Freightliner relationship was supposed to work, which is both in the record in Bayshore 1 and in this case, but the understanding from the contract, and there is also testimony in the Bayshore 1 trial that supports these points, is that, first of all, at least most of the parts were made by third-party vendors. Prior to the handover, Ford contracted with those vendors and said, we will buy parts from you and we will send them to the dealers on request. After the handover, Ford worked with Freightliner to make sure Freightliner had a relationship with those same vendors. So Ford was completely out of the deal? Well, to that extent, Ford was completely out of the deal, but there are separate provisions that I mentioned to you that are also at pages 858 to 862 that said there are other circumstances in which Ford is not completely out of the deal. Ford had a responsibility to keep sending parts to Freightliner to pass on to the dealers on request. Ford had a responsibility to send parts to dealers directly. Let me stop you there. You sold the heavy truck business and the parts business, correct? Correct. So at the date of the sale, did you turn over all the parts that previously Ford had to Freightliner, or was this sort of the things that were missed that would later be turned over to Freightliner? So the turnover of the existing parts went in stages. There were, as I understand the record, Ford said basically in the contract with Freightliner,  There's going to be a period of time when we are still taking the orders from these dealers. There's going to come a period of time when we have sent enough parts to you that we're going to have what's called the cutover date where you start taking the orders, but we will keep sending you the parts after that until our shelves are essentially clear of the existing parts. But the contract continued to contemplate that if Freightliner needed further parts, I guess that either Ford could make itself, that Ford still had in stock for whatever reason, or there were common parts that applied both to heavy trucks and other sorts of trucks. Freightliner could ask Ford to send those to Freightliner or to dealers. Did Ford ever send them to dealers? Well, this is not on the record. I can represent to you that we have record evidence that Ford did in fact send some parts directly to dealers, but it's not on the record. Okay. And the 54B argument, no appellate jurisdiction over the non-11 groups. And your response to that? Sure. My response to that is that the arguments about jurisdiction in 54B I think really miss the point. The Taylor case, the Richards case, the Collins case make clear that the question with respect to representative litigation is not whether the person is formally a party in the sense of having been named or brought before the court. The question is whether they're adequately represented and have noticed that someone else is before the court on their behalf. And, in fact, the restatement second of judgments, sections 34, 40, and 41, at least two of which Taylor relies on, say explicitly, you don't have to be a party. The court doesn't have to have jurisdiction over you. The whole point of this section is to talk about when that has not happened and when someone is nonetheless bound. And it also relaxed the privity. Yes, that's correct. Purpose as well. And if you look at the Taylor case, I mean, I think it's quite telling. Taylor has a situation where the question was whether someone was bound by someone else's litigation, of course. And the court never inquires into jurisdiction. That's not the issue. The issue is whether the non-party is nonetheless bound for one of the various reasons there can be privity, class litigation, agency, agreement, and so forth. And so I think you don't have to – the jurisdiction question is a bit of a red herring here. If we treat this as – or issue preclusion typically applies in the course of a single proceeding. But here you had – was this case effectively split into two with the Rule 54B judgments when they were entered in favor of the Bellwether plaintiffs? Well, I think – let me try to come at that in a couple of ways. I don't think that the liability issue was ever split into two. There was always a certified liability class. And the Bayshore One panel said it was finding against the dealers, which it defined as the full class of truck dealers with respect to liability. But I think a separate point, I guess, is – actually, I lost the thread. My apologies. I'll stick with my one point. When you get older like me, it happens more and more often. Mr. Olnick's argument essentially is that when the appeal was – or one of his arguments – is that when the appeal was taken, it was only as to the 11 and it could not cover the remaining 63. My response back is, but you lost on liability. Why would it be any different now if you apply issue preclusion? And the point with the 63 – what is the point on issue preclusion? What is your argument exactly? Sure. Let me tell you my argument and also, again, my response to them on the jurisdictional issue, which I think is more or less what you're raising. Right. My argument is that in all of the cases that are relevant on this point, and I specifically rely on Taylor, Richards, and Collins, the first two from the Supreme Court and the third from this court, the question with respect to representative litigation is twofold. Did someone agree – did someone have noticed the person who's not before the court? Were they adequately represented? And one of the issues that both Taylor and Richards say are relevant with respect to adequate representation is what was the understanding of the purported class representative as to whether they were, in fact, representing someone? And in this case, all three of those points very clearly show that there's issue preclusion here. There was adequate representation. These people chose to be represented by the same class counsel. The district court found that they were all aligned and they stayed in the same ambit in terms of who was representing them all the way through to the Supreme Court. They clearly had noticed. I don't think my friend on the other side will dispute that. And as to the understanding of the class representatives, they told the Supreme Court in no uncertain terms that they were there representing a class. And so my response on the jurisdictional issue, which is a variant of what Judge Sirica and I discussed, is that I think they want this case to be about whether the unnamed plaintiffs were formally before the court in the sense of jurisdiction, in the sense of final judgment. And that's not how the class representative cases have unfolded. They've asked whether someone who is not before the court, who is not a party, is nonetheless bound. Collins, in fact, directly quotes the restatement second of judgments on this point and says you do not have to be a party to a case to be bound. That's the whole idea of the representative litigation cases. Okay. Before you sit down, let me just come back to the factual issue that was brought up in Bayshore 1. It sounds to me like you're saying Ford did not post-sale manufacture parts. It never did. It was done by third-party vendors. Is that correct? So let me be as accurate as possible. I'm doing this based on the record. My understanding is that most, at least most, if not all of the parts were manufactured by third-party vendors. It may be that Ford itself manufactured some. I can't represent about that one way or the other with complete accuracy. But most were represented by vendors. Let's assume, Terry, that maybe they did manufacture some parts and accessories. Were any parts and accessories manufactured by Ford post-sale? So I'm going back to the same contract that I referred you to several times. That contract appears to contemplate that there may be some parts that Ford makes or I'm not totally clear on this, either makes or gets from someone with whom it has a contract that it could then send on as Ford parts to Freightliner or dealers at Freightliner's request. So, okay, at Freightliner's request. I think that usually when there's, in this contract, when there's an exchange of parts, either from Freightliner to Ford or Ford to Freightliner, it contemplates both actions. So if Ford were shipping them directly to the dealers, they would be doing it at Freightliner's request, in effect, as Freightliner's agent? I think that's right. I mean, I think that in a lot of ways, I don't think this court needs to get into the delegation issue because, you know, the only question is whether the first decision was a miscarriage of justice. This is not a re-litigation of the first case. But I think the fact of the matter is Ford and Freightliner were acting in tandem  There's lots of testimony that all the dealers continued to sell Ford parts right through the trial, which occurred in, you know, less than five years ago. All right. Thank you very much. Thank you. Mr. Allnick. Thank you, Your Honor. I appreciate the court's willingness to let me extend a little bit of your time. Let me start on the parts question. My friend cannot deny the singularly and most important fact that the right that the Ford dealers had under the Ford sales and service agreement to be able to receive Ford parts and sell them for resale could only be accessed after Ford left the parts business if and only if they agreed to a separate contract binding themselves to many, many additional obligations that they did not have as Ford dealers. It changed. The only way they could obtain those parts was if, and I cite you again to 902 in the record, the only way they can obtain Ford parts at that point would be to become a sterling dealer. And that wasn't any requirement that they had when they signed their agreement with Ford. When they signed their agreement with Ford, it said Ford shall supply company products to the dealer. That's 2B in the original contract. Ford shall supply company products. Ford, after March of 1998, supplied no company products. And the only way those dealers could get those company products would be to sign a separate agreement with Sterling. So they didn't delegate their agreement. They didn't live up to their agreement. They breached their agreement. And there really, I don't think, is any question about that. Now let me talk quickly about issue preclusion and the time I have left. Let me respond to the point that was made in the brief and by counsel this morning. Well, you told the Supreme Court that you were there for the class. What happened in the Supreme Court is counsel for the 11 plaintiffs who were before the Supreme Court made that representation to them, not counsel for the 63. We were wrong in that statement, saying that we were there for class. We made a mistake. Everybody can make a mistake. That's what we're all talking about here today. We made one there. But we can't create jurisdiction where it doesn't exist. Nothing that counsel says creates jurisdiction. And this court has been very firm about that in the past. So our saying that we were a class, that it was a class, or our saying that the court had jurisdiction doesn't make it so. You have to make a decision under 54B and under Boghossian, which my friend never comes to grips with. He wants to talk about cases in which there were 23C3 judgments that were entered. There was no 23C3 judgment entered in this case. And under Boghossian, under Rule 54B, once you sever everybody out from that case, that case can, in fact, be decided more than once. Now in most cases, it's going to be decided the same way. Here we have the highly unusual situation where because one of the facts that was relied on by the prior panel is demonstrably incorrect, you should not follow that. So I see that my time is up. I don't know if there are any more questions. Thank you very much. Thank you, both counsel, for very well presented arguments. I would like, counsel, if you would get together with the clerk's office, have a transcript, a pair of the sole arguments that the costs, and I'm privileged having you here. Both of you, very well done.